Filed 6/21/13  In re L.B. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re L.B., a Person Coming Under the Juvenile Court Law. | D063519 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518268) |
| v. | |
| D.B., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

D.B. appeals the judgment terminating her parental rights to her daughter, L.B. D.B. contends the juvenile court abused its discretion by denying her modification petition (Welf. & Inst. Code, § 388),[1] which sought L.B.'s placement with D.B. with family maintenance services, or reinstatement of D.B.'s reunification services. D.B. also contends the court erred by declining to apply the beneficial relationship exception (§ 366.26, subd. (c)(1)(B)(i)) to termination of parental rights. We affirm.

BACKGROUND

D.B. has a history of using illicit drugs and alcohol and minimizing her substance abuse. In 2005, she was placed on five years' probation for driving under the influence. She used marijuana and methamphetamine while pregnant with L.B., who was born in December 2010. D.B. also has a history of domestic violence with L.B.'s father, Jesse B., and minimizing the violence. In addition, D.B. has a history of depression, anxiety and mood swings. She was emotionally unstable and inconsistent in accepting treatment for her problems.

In October 2011, when L.B. was 10 months old, the San Diego County Health and Human Services Agency (the Agency) filed a dependency petition. The petition consisted of one count and alleged L.B. was exposed to domestic violence between Jesse and D.B. (together, the parents). The petition cited two specific incidents of violence by D.B. and alleged prior domestic violence. L.B. was detained in Polinsky Children's Center and then in a foster home.

---

[1]     Further statutory references are to the Welfare and Institutions Code.

2

In January 2012, the Agency filed an amendment to the petition, adding a second count. That count alleged L.B. was exposed to domestic violence between the parents. Specifically, on October 21, 2011, the parents had an argument and Jesse hit D.B. in the face. The second count also alleged the parents' domestic violence history included 10 prior incidents.

In January 2012, the court dismissed the first count of the dependency petition and entered a true finding on the second count. The court ordered reunification services for D.B. and ordered L.B. placed with a relative.

L.B. was immediately moved to the relative's home. There, L.B. exhibited self-destructive behavior, such as hitting herself in the face and hitting her head on the ground. After a few months, the relative said she could no longer care for L.B. because D.B. "frequently harassed [the relative] with texts and calls."

In April or June 2012, L.B. was placed with a maternal aunt (the aunt). L.B. thrived in the aunt's home and formed a strong bond with her. The aunt taught L.B. to redirect her self-destructive behavior, and that behavior dissipated. D.B.'s inconsistent contact caused L.B. "confusion and tumultuous emotions," however, and L.B. displayed signs of distress after their visits.

In early 2012, D.B. had a positive drug test and, on two other occasions, tampered with test samples. In June, the maternal grandmother reported the parents "had recently gotten into 'a fight' " during which the windows in Jesse's apartment were broken. The maternal grandmother also said D.B. had sent her photographs showing that Jesse had broken a television in D.B.'s new residence. In July, D.B. failed to appear for a visit, then

3

went to the aunt's home, yelled at her and threatened to kill herself.  Later that month, D.B. failed to appear for a drug test.  At the six-month review hearing in September, the court terminated reunification services and set a section 366.26 hearing.

D.B. was late to three of the five visits that took place in January and February 2013.  During one of those visits, in L.B.'s presence, D.B. repeatedly told the monitor that the aunt was an unfit caregiver.  During another visit, D.B. behaved erratically and ignored the monitor's requests.

In February 2013, D.B. filed her section 388 petition.  In March, the court denied the petition and terminated parental rights.  L.B. remained in the home of the aunt, who wished to adopt her.

THE SECTION 388 PETITION

Section 388 allows the juvenile court to modify an order if a party establishes, by a preponderance of the evidence, that changed circumstances exist and the proposed modification would promote the child's best interests.  (*In re Zachary G*. (1999) 77 Cal.App.4th 799, 806.)  When a case is past the reunification phase, the focus is on the child's need for permanency and stability, and there is a rebuttable presumption that it is in the child's best interests to remain in the current placement.  (*In re Stephanie M*. (1994) 7 Cal.4th 295, 317.)

We review the denial of a section 388 petition for abuse of discretion.  (*In re Jasmon O*. (1994) 8 Cal.4th 398, 415.)  Thus, we will not reverse unless the juvenile court's decision was "arbitrary, capricious, or patently absurd" (*In re Stephanie M*., *supra,* 7 Cal.4th at p. 318) and "exceeded the bounds of reason" (*id.* at pp. 318-319).  "We do

4

not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)  We therefore accept the juvenile court's finding that D.B. was not credible.

As circumstances that had changed since the termination of services, D.B.'s section 388 petition alleged the following.  D.B. had completed a parenting class, obtained full-time employment and secured appropriate childcare and stable housing. She had maintained regular and consistent visitation.[2]  She had attended substance abuse treatment, continued to attend Narcotics Anonymous (NA) and Alcoholics Anonymous (AA) meetings, was sober and had a negative drug test in October 2012.  She had seen a psychiatrist, had been under a doctor's care for medication management and continued in therapy.

D.B.'s section 388 petition alleged it would be in L.B.'s best interests to be placed with D.B. with family maintenance services, or for D.B. to receive reunification services, for the following reasons.  D.B. had participated in services and improved in the areas that had led to this case.  She had a stable and safe home for L.B.  They shared a significant bond that would be strengthened.  L.B. would have access to medical information.

Attachments to the petition included the following.  A letter from D.B.'s therapist stated D.B. attended 17 sessions between February 2012 and January 2013.  According to a certificate dated September 19, 2012, the date the court terminated services, D.B.

---

[2]    After services were terminated, D.B. visited L.B. at least once a week for a total of approximately 21 visits.  D.B. was late to some of the visits.

5

completed "8 hours and 4 weeks" of a parenting course. A February 2013 letter from a physician ─ not a psychiatrist ─ stated he had last seen D.B. in June 2012, and in the past she had taken anti-anxiety medication. A meeting verification slip, on the letterhead of Harmony West Women's Recovery Center (Harmony), listed 25 NA and AA meetings in January and February 2013, with no verification of D.B.'s attendance at the last five meetings. A January 2013 letter from a counselor at the Parent Care program stated D.B. "complet[ed] an intake" on October 12, 3012, and had a negative drug test. After the intake, D.B. had no further contact with Parent Care.

D.B.'s therapist testified D.B. had stopped and resumed therapy twice. Most recently, D.B. had resumed therapy one and one-half or two months before the hearing and had attended six sessions. Her treatment goals were to stay sober, manage her anxiety and depression and be a good parent. D.B.'s circumstances had improved; she was "progressing" and was more stable. She recognized she had been in a violent relationship and accepted responsibility for its effect on L.B. D.B. needed to continue working on putting L.B.'s needs before her own and needed to see a psychiatrist to determine whether she should continue taking medication for her anxiety and depression. D.B. had "fulfilled . . . 65 to 70 percent" of her treatment goal of coping with stressors. It would take her three to five months to meet her treatment goals if she attended therapy every two weeks.

D.B. testified she stopped taking psychotropic medication a month or two before the hearing when her prescription expired, but she had an upcoming appointment with her physician. D.B. left Harmony on October 18, 2012, by mutual agreement, because she

6

was looking for full-time work and she found a job whose hours conflicted with Harmony's hours. D.B. was not in a substance abuse treatment program, and was looking for a program that would accommodate her work schedule. She attended NA and AA meetings about three times a week but did not have a sponsor. Her meeting verification slip was unrelated to Harmony, although it was on Harmony letterhead; she was given the slip when she was at Harmony and "continued to use it." She had been sober since services were terminated and had a relapse prevention program. She completed the parenting class online. Social worker David Viafora had told her that half of the class should be "in person," but when she gave him the parenting certificate, he said it was acceptable that she had completed the entire course online.[3] D.B. had recently moved into an apartment, and was planning to move into a two-bedroom apartment with a roommate. D.B. first denied there had been 10 prior incidents of domestic violence, then acknowledged that fact.

The court found that D.B. had not shown changed circumstances and opined D.B. was not "very credible." The court noted that D.B. was working, had housing and was less anxious, and supervised visits were "generally good." However, there was "not much evidence at all of any change" concerning the issues of domestic violence, substance abuse and mental health, the issues that led to the dependency. Throughout the

---

[3] D.B. testified variously that Viafora made his statement of acceptance on January 19, with no year specified, and on September 19, 2012. Viafora testified at the September 19, 2012, six-month review hearing that he had told D.B. several times she was required to complete half of the parenting class in person; Viafora's supervisor and the parenting instructor agreed with this requirement. After the six-month review hearing, social worker Robyn Garnett replaced Viafora as the social worker in this case.

7

dependency, D.B. had a history of starting and stopping substance abuse treatment. There was no proof she had completed substance abuse treatment or that she had participated in treatment since the court terminated services. D.B. did not make that treatment a priority; she took a job whose hours interfered with her treatment program. Her October 12, 2012, drug test was not a random test; it was on a date of her choosing. There were no later test results and no evidence D.B. was sober. Her submission of AA and NA sign-in sheets on Harmony letterhead was misleading, and designed to suggest she had participated in Harmony for a period beyond her actual participation. D.B. had not seen a psychiatrist since the court terminated services, although early in the case a psychologist had recommended an assessment for psychotropic medication.[4] D.B.'s assertion that she continued in therapy was misleading; she quit in September 2012 and did not resume until approximately two months before the hearing. She continued to minimize the domestic violence in her relationship with Jesse, testified there was only one violent incident, and had made no progress on this issue. D.B.'s completion of a parenting class on the day the court terminated services was not a change, and the Agency had not approved the class.

The court found that D.B. had not shown the proposed changes would be in L.B.'s best interests. D.B.'s minimization of the domestic violence with Jesse, her failure to complete a substance abuse program and the question whether D.B. was sober created "a

---

[4]     The recommendation was made in February 2012.

huge risk" for L.B. There was no evidence that in two months[5] D.B. would be able to meet L.B.'s needs consistently. L.B. enjoyed the supervised visits, but she had been in numerous placements and "was a troubled little girl."

D.B. argues we should consider "the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; . . . the strength of relative bonds between the dependent child[] to both parent and caretakers; . . . the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been" (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532, italics omitted); the length of time the child has been in the dependency system; and the reason a change did not occur sooner (*id.* at p. 531). A consideration of these factors would not assist D.B. Her history of substance abuse, domestic violence and mental health issues were serious problems that continued despite the services available to her. She continued to minimize those problems. Two-year-old L.B. had been in the dependency system for 16 months and had lived with the aunt for at least seven months. Although L.B. had a bond with D.B., she had a secure and healthy bond with the aunt and needed the safety, security and stability the aunt provided.

The court did not abuse its discretion in denying the section 388 petition.

### THE BENEFICIAL RELATIONSHIP EXCEPTION

D.B. does not contest the finding L.B. was adoptable. If a dependent child is adoptable, the court must terminate parental rights at the section 366.26 hearing unless

---

5      The 18-month date was less than two months away.

the parent proves the existence of a statutory exception. (§ 366.26, subd. (c)(1); *In re Helen W.* (2007) 150 Cal.App.4th 71, 80-81.) An exception exists if a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A beneficial relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) If terminating parental rights "would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome . . . ." (*Ibid.*) The existence of a beneficial relationship is determined by "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*Id.* at p. 576.) Examining the evidence in the light most favorable to the judgment (*ibid.*), we conclude substantial evidence supports the court's finding that the bond between D.B. and L.B. was not so strong as to outweigh L.B.'s need for permanence.[6]

Two-year-old L.B. had been out of D.B.'s care for 16 months, nearly two-thirds of her life. D.B. never progressed beyond supervised visitation. During visits, D.B. was

---

6  The court did not address the regularity of D.B.'s visitation and contact with L.B. As noted above, D.B. visited L.B. at least once a week after services were terminated, but was late to some visits. Earlier in the case, D.B. visited inconsistently.

affectionate with L.B. In general, L.B. was excited to see D.B. and was affectionate with her.[7] L.B. enjoyed visits and seemed comfortable with D.B.

D.B. often played and interacted with L.B. appropriately, empathized with her and assumed a parental role. L.B. regularly brought food to visits and fed L.B., and sometimes changed her diaper. D.B. praised L.B. when she listened to instructions. At one visit, when L.B. hit herself, D.B. redirected L.B. and consoled her when she became upset.

However, D.B. was sometimes inappropriate during visits. In 2011, she fed L.B. foods that caused her to choke, argued with visitation monitors and needed to be reminded to focus on L.B. In 2012, D.B. sprayed hand sanitizer all over L.B.'s body, ostensibly to treat a rash, and ignored requests to stop because L.B.'s doctor had not approved the spray. In February 2013, D.B. applied makeup to L.B. during a visit, although she was aware L.B.'s skin was very sensitive and L.B.'s doctor said L.B. should not have anything on her skin except unscented soap and lotion. Both before and after services were terminated, D.B. asked whether Jesse could accompany her to visits, although the case plan provided for separate visits and D.B. had signed an agreement to visit separately. D.B. referred to Jesse as "a deadbeat father" in L.B.'s presence.

---

[7] L.B. was also excited to see her daycare provider, her Head Start worker and playmates.

Social worker Garnett believed L.B. had a bond with D.B.,[8] but it was not a parent-child bond and L.B. viewed D.B. as a friendly visitor. L.B. had a secure and healthy bond with the aunt and needed the safety, security, stability and consistency the aunt provided. L.B. sometimes asked D.B for help during visits, but also sought help from Garnett and asked for the aunt. L.B. called D.B. "mommy" and the aunt "auntie," "momma" and "mommy." L.B. did not ask for D.B. between visits.

## DISPOSITION

The judgment is affirmed.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

McDONALD, J.

---

[8] Previous social workers stated D.B. and L.B. had a strong bond.